```
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
```

FREDDIE LUSTER,                :
                                :
     Plaintiff,           :
                                :       CIVIL ACTION
v.                     :
                                :       NO. 1:09-cv-1946-JOF-ECS
LOCKHEED MARTIN CORPORATION,   :
                                :
     Defendant.          :
                                :
                                :

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

**I.**
**Introduction**

This matter is before the Court on Defendant's motion for summary judgment. [Doc. 137]. On July 17, 2009, Plaintiff Freddie Luster ("Plaintiff") filed this civil action against Defendant Lockheed Martin Corporation ("Defendant"), alleging discrimination on the basis of race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"). [Doc. 1].[1] Specifically, Plaintiff alleged that he was terminated on March 14, 2008, for violating Lockheed's email

---

[1] Plaintiff's original complaint named Anthony Robinson as a co-plaintiff. On July 8, 2010, District Judge Forrester issued an order severing Plaintiff's and Mr. Robinson's cases. See [Docs. 28, 69]. Plaintiff's case retained the case number indicated above, and Mr. Robinson's case was assigned case number 1:10-cv-2122-SCJ-ECS.

policies, but "at least one other white supervisory employee committed the same violation, [and] was not terminated." [Pl's Am. Comp. ¶ 1, Doc. 70]. Plaintiff sought, among other things, back pay, compensatory damages, punitive damages, and attorney's fees. [Id. at p. 8-9].

On September 14, 2011, after the completion of a protracted discovery period, Defendant filed the instant motion for summary judgment. [Doc. 137]. Although Plaintiff filed a timely response in opposition to Defendant's summary judgment motion, the Court held two phone conferences with the parties in November 2011 to address, among other issues, the length and substance of "Plaintiffs' Joint Statement of Additional Undisputed Material Facts That Present A Genuine Issue For Trial." See [Docs. 171, 172]. As a result of said conferences, the Court struck Plaintiff's statement of material facts and allowed Plaintiff to re-file both an amended response and statement of material facts by December 30, 2011. [Id.]. The Court also allowed Defendant to have until January 31, 2012, to file a reply.

The motion, having been fully briefed, is now ripe for the Court's consideration. For the reasons discussed herein, **IT IS RECOMMENDED** that Defendant's motion for summary judgment, [Doc. 137], be **DENIED**.

AO 72A
(Rev.8/82)

## II.
## <u>Preliminary Matters</u>

**A.  Defendant's Objection to the Persinger Declaration**

Before considering Defendant Lockheed's motion for summary judgment, the Court will address Lockheed's objection to the declaration of computer forensic expert Jim Persinger. [Doc. 174]. Plaintiff filed Persinger's declaration after the close of discovery and in response to Lockheed's motion for summary judgment. [Doc. 179-2]. Plaintiff cites Persinger's declaration to support the following proffered material fact: "Shortly after Vincent finalized his forensic analysis of Luster's computer, Lockheed's Senior Human Resources Manager, Calving Bryant ("Bryant"), began creating a disciplinary spreadsheet using Microsoft Excel on November 7, 2006." <u>See</u> [PSMF ¶ 44, Doc. 180 (citing Persinger Decl. ¶¶ 9-14)]. Lockheed has objected to Persinger's declaration on the grounds that Plaintiff failed to identify Persinger at any time before filing his response to Lockheed's summary judgment motion and cannot provide a justifiable reason for the delay.[2] [Doc. 174].

In response to Lockheed's objections, Plaintiff contends that "the need for Persinger's declaration did not arise until after the close of discovery, when Lockheed submitted the Declaration of

---

[2]  Plaintiff supplemented his Initial Disclosures to show Persinger as a witness after the declaration was filed, on November 9, 2011. [Doc. 169].

Calvin Bryant, which contained clearly false testimony regarding the date that Bryant prepared certain versions of the disciplinary spreadsheet that Lockheed relied upon when issuing the disciplinary decisions in this case." [Doc. 175 at 1]. Lockheed replies that Persinger's testimony does not show any inaccuracies or inconsistencies in Bryant's testimony and that Plaintiff is "exaggerating allegations of perjury" to "justif[y] the untimely disclosure of their expert witness." [Doc. 178 at 1].

**1. The Testimony at Issue**

**a. Bryant's Deposition Testimony and Declaration**

During discovery, Lockheed produced three spreadsheets, each containing the following heading: "Lockheed Martin Proprietary Information E-Mail/Internet Investigation 11/06 HRBP Action." See [Clark Dep., Ex. 2; Cooper Dep., Ex. 17; Bryant Dep. I, Ex. 19]. The spreadsheet marked as Plaintiff's Exhibit 19 was produced to Plaintiff in the form of an "electronic file," while Plaintiff's Exhibits 2 and 17 were produced in print and had Bryant's handwriting on them. See, e.g., [Bryant Dep. I, pp. 40, 41].

In his April 2011 deposition, Bryant testified that he recalled preparing "a spreadsheet" after receiving the SES investigative report in April 2007. [Bryant Dep. I, pp. 24-28]. However, he could not recall when he created the first spreadsheet for the subject investigation. [Bryant Dep. I, p. 28]. Bryant later answered "yes"

4

when asked if the information contained in the three spreadsheets (Pl.'s Exs. 2, 17, 19) came from the April 2007 SES investigative report. [Id. at pp. 84-85].   After testifying that he could not remember how he compiled the information in certain non-produced spreadsheets, Bryant was asked whether looking at other spreadsheets would help him to recall, to which Bryant responded: "I create spreadsheets and sometimes I will start from the one that's existing or sometimes I'll start completely new, so I don't recall." [Id. at pp. 61-62].

On August 3, 2011, Bryant was deposed a second time and questioned again about the disciplinary spreadsheets. [Bryant Dep. II, pp. 324-329]. Plaintiff's counsel pointed out to Bryant that "11/06" in the spreadsheet heading of Exhibit 17 "seem[ed] to be a reference to November of 2006," and Bryant agreed. [Bryant Dep. II, p. 325]. Bryant was then asked whether the column on the Exhibit 19 spreadsheet entitled "Recommended Action" helped him to recall when Exhibit 17 was drafted, to which Bryant responded: "No, it doesn't." [Id.]; accord [Bryant Dep. I, pp. 40-41].

On September 12, 2011, Bryant executed a post-discovery declaration, which Lockheed attached and cited in support of its motion for summary judgment. [Bryant Decl., Doc. 137-20]. In his declaration, Bryant testified that he believed Exhibit 17 to be the version of the spreadsheet that was used in the December 2007

disciplinary committee meetings because it "does not contain recommended disciplinary action." [Bryant Decl. ¶ 12]. Bryant further declared that

> [t]he spreadsheet that I created, which is titled "E-mail/Internet Investigation" spreadsheet, is dated "11/06." That date is a typographical error and I actually prepared the spreadsheet in November 2007.

[Id. ¶ 14]. Similarly, Bryant described the "date of 11/06" on the Exhibit 19 spreadsheet as incorrect, stating, "I prepared this document in November 2007." [Id. ¶ 29].

### b. Persinger's Declaration

In his declaration, Persinger states that Plaintiff's counsel retained him to determine whether Bryant's post-discovery declaration testimony was consistent with the Metadata stored in the electronic file that Lockheed produced during discovery. [Persinger Decl., ¶ 9, Doc. 179-2]. For this purpose, Persinger performed a forensic analysis on the electronic file and found that the spreadsheet known as Exhibit 19 was created on November 7, 2006. [Id. ¶¶ 9-12]. Based on his findings, Persinger states that "Bryant's declaration testimony is inconsistent with the forensic evidence from the Metadata contained in the spreadsheet." [Id. ¶¶ 12, 14]. According to Persinger, if, as Bryant contends in his declaration, the "initial spreadsheet," Exhibit 17, was created in November 2007 and used in the December 2007 disciplinary committee meeting; and if, as Bryant also contends, the spreadsheet known as

6

Exhibit 19 was created sometime after Exhibit 17, then either or both of Bryant's statements in paragraphs fourteen (14) and twenty-nine (29) of his declaration are false because the Metadata shows that Exhibit 19 was created on November 7, 2006. [Id. ¶¶ 12-16].

**2.  Relevant Law**

Federal Rule of Civil Procedure 26(a)(1)(A) requires the disclosure of all persons likely to have discoverable information, including expert witnesses. Fed. R. Civ. P. 26(a)(1)(A), (a)(2)(A). Similarly, the Local Rules of this Court provide that a party must disclose an expert witness "sufficiently early in the discovery period ...." LR 26.2(C) NDGa.  A party who fails to provide information or identify a witness as required by Rule 26(a) or (e) is not permitted to use the witness or his information to supply evidence on a motion or at trial, unless expressly authorized by court order based upon a showing that the failure to comply was justified. See [Id.]; Fed. R. Civ. P. 37(c)(1).  The district court has broad discretion in determining whether the non-disclosure of a witness is justified.  Two Men and a Truck Intern., Inc., v. Residential & Commercial Transport Co., LLC, No. 4:08cv67-WS/WCS, 2008 WL 5235115, at *2 (N.D. Fla. Oct. 20, 2008) (citations omitted) (stating that a Rule 37(c)(1) determination should be guided by the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the

surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence").

**3. Should Persinger's declaration be excluded?**

Under the circumstances presented here, the Court finds that Plaintiff has provided justification for the delay in disclosing Persinger's declaration testimony. At the close of discovery, the creation date of the spreadsheet (as opposed to the date Bryant claims he filled it with information) spoke for itself and was not in issue. Bryant testified in his first deposition that he could not remember when he created the first version of the spreadsheet but recalled relying on the SES investigative report from April 2007 in "preparing ... a spreadsheet." See [Bryant Dep. I, pp. 25-28]. In his second deposition, Bryant offered no affirmative recollections of dates when asked about the temporal relationship between different versions of the spreadsheets (Exs. 17, 19) but agreed that "11/06" in the spreadsheet heading appeared to be a reference to November 2006. [Bryant Dep. II, pp. 324-329]. After the close of discovery, Bryant, for the first time, testified unequivocally in his declaration that he had "prepared" the Exhibit 17 spreadsheet in November 2007 and that the reference to "11/06" in the heading was a "typographical error." See [Bryant Decl. ¶ 14].

Lockheed's argument that Plaintiff was on notice and should have foreseen the need for a forensics expert is without merit. E.g., [Doc. 174 at 11]; [Doc. 178 at 1-2]. Plaintiff could not have foreseen that Bryant would later testify that he made a typographical error when he typed "11/06" when preparing the Exhibit 17 spreadsheet in November 2007. Nor could Plaintiff have foreseen the impact of such testimony on the timeline of events as they stood at the close of discovery. See [Doc. 175 at 16-19]. Persinger's testimony is important in that it shows the Metadata in the electronic file to be inconsistent with Bryant's declaration testimony, and it supports the proffered fact that Bryant created the spreadsheet before he received the final SES investigation report in April 2007. See [Persinger Decl. ¶¶ 14, 15]; [Doc. 175 at 15-19]; [PSMF ¶¶ 44].

Lockheed contends, however, that Bryant's post-discovery declaration is not inconsistent with his deposition testimony. Specifically, Lockheed submits Bryant's previous deposition testimony — that Bryant sometimes "will start from the one that's existing or sometimes ... start completely new" when creating spreadsheets — to show that the "virtual creation" date of the file in November 2006 is irrelevant. See [Doc. 178 at 13-14]; [Bryant Dep. I, pp. 61-62]. Lockheed's argument is unavailing. Bryant did not testify in either of his depositions that he created the Exhibit

9

17 spreadsheet from a pre-existing spreadsheet containing a "virtual creation" date of November 2006.  Nor did Bryant testify in his declaration that he had used an old, unrelated spreadsheet when creating Exhibit 17. Rather, he testified that he typed "11/06" incorrectly in the heading when preparing the Exhibit 17 spreadsheet in November 2007. <u>See</u> [Bryant Decl. ¶ 14]; [Doc. 175 at 12-13]. Thus, any testimony Bryant might now give that he was working off pre-existing spreadsheets is a matter in dispute and inconsistent with the statements in his declaration.

For these reasons, the Court finds that Plaintiff has shown justification for failing to disclose the identity and declaration testimony of Jim Persinger until after the filing of Defendant's motion for summary judgment. Moreover, for purposes of Rule 26 and Rule 37(c), the Court finds that Plaintiff has disclosed Persinger at the earliest possible opportunity and provided the Court with adequate reasons for the non-disclosure. Persinger's declaration is admissible in opposition to Defendant's motion for summary judgment. Defendant's objection, [Doc. 174], is therefore **OVERRULED**.[3]

---

[3]  If the recommendation in this report that summary judgment be denied is adopted, Defendant should be given the opportunity to depose Plaintiff's expert and obtain an expert of its own if it wishes to do so. Defendant should, in that event, file a motion seeking such relief.

AO 72A
(Rev.8/82)

**II.**
**Factual Background**

When evaluating the merits of a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001); <u>Hairston v. Gainesville Sun Pub. Co.</u>, 9 F.3d 913, 920 (11th Cir. 1993). Applying the above legal standard, the Court derives the facts in this case from the parties' statements of facts and from the record as a whole.[4]

Unless otherwise noted, this overview is taken from those facts in parties' Statements of Material Facts ("SMF") that have not been disputed, and those facts in the parties' statements that may be disputed in the light most favorable to Plaintiff.

---

[4]     The Court will take this opportunity to comment on the state of the record in this case, particularly Plaintiffs' Statement of Additional Material Facts, [Doc. 180]; Lockheed's Statement of Material Facts, [Doc. 137-33]; Plaintiffs' Response to Lockheed's Material Facts, [Doc. 181]; and the fourteen (14) declaration testimony exhibits attached to Lockheed's summary judgment motion, [Docs. 137-19 - 137-32]. The Court found itself having to wade through the voluminous record, often cross-referencing each statement of "fact" with several sources to ascertain, inch by inch, the actual material facts upon which the parties' assert their arguments. Most burdensome, the Court found that Plaintiffs Luster and Robinson failed, in many instances, to provide "concise, nonargumentative responses" as required by Local Rule 56.1.B.(2)(a)(1), NDGa.

11

## A.   Background

In  May  2005,  Lockheed  Martin  fired  seven  white  employees,
including  four  supervisors,  at  its  Marietta,  Georgia  facility  for
their  failure  to  report  and  their  distribution  of  a  racially
offensive  e-mail  entitled  "Top  Ten  Reasons  Why  There  are  No  Black
NASCAR  Drivers."[5]  See  [Heiserman  Dep.,  Ex.  44  at  ¶  10,  Doc.  188-2  at
7];  Smith  v.  Lockheed-Martin  Corporation,  No.  1:06-CV-1774-BBM-1
(N.D.  Ga.),  vacated  by  644  F.3d  1321  (11th  Cir.  2011)  ("Smith").  The
investigation  into  the  e-mail  began  after  Nelson  Phillips,  a  black
employee  at  Lockheed's  Marietta  plant,  saw  the  e-mail  and  filed  a
complaint  with  the  Company's  Human  Resources  ("HR")  department.
Smith,  644  F.3d  at  1331-32.

On  July  28,  2006,  five  of  the  terminated  employees — three
supervisors  and  two  non-supervisors — sued  Lockheed  alleging  that
their  former  employer  had  applied  its  workplace  harassment  policy  in
a  discriminatory  manner  that  disfavored  whites.  Smith  [Docs.  1,  189
at  2-4];  [PSMF  ¶  123].[6]  Lockheed  denied  the  plaintiffs'  allegations,
and  discovery  in  Smith  began  on  or  about  September  20,  2006.  Id.
[Docs.  8-21];  [PSMF  ¶  124].  After  the  close  of  discovery,  in  July

---

[5]  The  "No  Blacks  in  NASCAR"  e-mail  contained  a  top-ten  list
of  racially  derogatory  stereotypes,  including  references  to  black
people  as  "criminals,  pimps,  and  gang  members."  Smith,  644  F.3d  at
1324.

[6]  The  Smith  case  was  assigned  to  former  District  Judge  Beverly
Martin  and  referred  to  the  undersigned  magistrate  judge.

2008, Lockheed moved for summary judgment in Smith. See Smith [Doc. 144]. Lockheed's brief in support of summary judgment cited, among other things, the March 2008 terminations of supervisors Freddie Luster and Anthony Robinson — the black plaintiffs in this case — to show that the Company also fired non-white employees for "forwarding racially-offensive email ...." See Smith [Docs. 180 at 11-12, 178 at 7 n.8].

On January 7, 2009, this Court entered a Report & Recommendation ("R&R") in Smith, recommending that summary judgment be granted in favor of Lockheed as to the white plaintiffs formerly employed as supervisors but denied as to those who had worked in non-supervisory positions. See Smith [Doc. 189 at 26-52]. In so doing, the undersigned found that the white supervisors had not established a prima facie case of disparate treatment race discrimination, in part because they could not identify other non-white supervisors who were not terminated after distributing a racially offensive e-mail and failing to report it. See id. [Doc. 189 at 29-30].[7] Over the supervisors' objections, District Judge Martin also found that the supervisor plaintiffs could not establish "less favorable treatment as compared to similarly situated individuals outside their protected class," and she adopted that

---

[7] Lockheed had asserted that their policies created special requirements for supervisors that were not applicable to non-supervisory employees.

13

portion of this Court's R&R. Id. [Doc. 196 at 21-22]. The supervisors appealed. Id. [Doc. 230].

On June 30, 2011, a panel for the Eleventh Circuit vacated the District Court's judgment and remanded the case for further proceedings. Smith, 644 F.3d at 1347. The Circuit Court found that the lower court had misapplied, and overly relied upon, the McDonnell-Douglas framework in arriving at its decision. Smith, 644 F.3d at 1327-29. More specifically, the Circuit Court held that, notwithstanding the plaintiff's[8] inability to identify a similarly situated comparator, the "record contained sufficient evidence to allow a jury to infer that Lockheed fired [the supervisor] because he is white." Id. at 1327-1329. The Circuit Court identified several ways in which the evidence suggested that Lockheed's asserted reasons for terminating the plaintiffs had been pretextual. Id. at 1341-47. Among them, the method and manner in which Lockheed justified its subsequent, lesser discipline of black employees in August 2005 for their involvement with a racially insensitive e-mail targeting whites entitled "How to Dance Like a White Guy." See id.

_____

[8] Supervisors Smith, Gann, and Mitten had initially appealed the case together. While the appeal was pending, Smith's estate and Gann reached a settlement with Lockheed, leaving Mitten as the sole appellant at the time of the Eleventh Circuit decision. See Smith, 644 F.3d at 1327 nn.20-22.

14

at 1338-43.[9]   In addition, the Court noted that the termination decisions in <u>Smith</u> had been made at a time when Lockheed was under pressure to show that it did not tolerate white-on-black racism. <u>See Id.</u> at 1341-47.  As such, Luster and Robinson were described by the Court as "inherently weak[]" comparators to be cited in favor of summary judgment, in part because Lockheed had taken the exculpatory action of firing Luster and Robinson while litigating <u>Smith</u>. <u>Id.</u> at 1344 n.80. The Court found such actions to be "equivocal in purpose, motive, and permanence." <u>Id.</u> (citation omitted).

**1. After the "No Blacks in NASCAR" Terminations**

The employee disciplinary decisions relating to the "No Blacks in NASCAR" e-mail followed an investigation that involved twenty-one employees who came into contact with the e-mail. [DSMF ¶ 6]. On May 9, 2005, soon after the white employees in <u>Smith</u> were terminated, Lockheed's Executive Vice President, Ralph Heath, sent an e-mail memorandum ("the Heath Memo") about the "No Blacks in NASCAR" e-mail investigation and termination decisions to all of the more than 20,000 employees in the Lockheed Martin Aeronautics Company division of the Company. [DSMF ¶ 11]; <u>Smith</u>, 644 F.3d at 1337.  Heath's memo noted, among other things, that the Company "does not tolerate

---

[9] The "How to Dance Like a White Guy" e-mail contained a video clip that made references to whites as "crackers," "whities," "honkies," and "homos," as well as to Adolf Hitler, female genitalia and masturbation. <u>Smith</u>, 644 F.3d at 1338.

offensive, derogatory or inappropriate behavior" and "will not tolerate harassment of any kind, including discriminatory or stereotypical remarks or inferences." [Pl.'s Ex. 3 to Bryant Dep., Doc. 137-5 at 52-53]. The Heath Memo advised that "each and every employee needs to be familiar with the provisions of Corporate Policy Statement (CPS) 564 'Prohibition Against Harassment' and the AeroCode (AC-92) policy for 'Harassment-Free Workplace',..." as well as the policies on workplace diversity. [Id.].

Since the "No Blacks in NASCAR" e-mail investigation, Lockheed has continued to investigate incidents of inappropriate and offensive e-mail and has disciplined employees for their involvement with such email. [DSMF ¶ 14]. Lockheed holds supervisors to a higher standard than all other employees because they have special responsibilities pursuant to the Company's policies. [DSMF ¶ 72]. Supervisors have a duty to report any offensive emails that they receive from someone employed by the Company. [DSMF ¶ 72]; [Bryant Decl., ¶¶ 9, 27].

## 2. Relevant Lockheed Martin Policies

Lockheed maintains several policies addressing e-mail usage, non-discrimination and a harassment-free work environment. [DSMF ¶ 75]. The company policy on e-mail use (AC-1988) prohibits "downloading, storing, printing, or displaying files or messages that are profane or obscene...." [DSMF ¶ 77]. AeroCode 92, Lockheed

16

Martin's harassment-free workplace policy, prohibits sexual and discriminatory harassment in the workplace, including

> sexually suggestive, obscene, or lewd comments, ... innuendo to give conversations or messages a sexual meaning, ... displaying (by any medium, including computers) or distributing objects, pictures, drawings, images, messages, letters, calendars, posters, or cartoons which are inflammatory, offensive, or sexually suggestive, ... and ... racial slurs, ethnic jokes, sexual or lewd jokes, negative or derogatory stereotypes, names, or labels that a reasonable person would find offensive.

[PSMF ¶ 1]; [DSMF ¶ 76]. Lockheed's workplace harassment policy defines "offensive" as "[s]tatements or jokes that reference a person or group of people because of gender, race, ethnicity, age, physical characteristics, disability, religious beliefs, or sexual preference...." [PSMF ¶ 4].

Discipline for e-mail related violations can range from reprimand to termination. [O'Brien Dep., Pl.'s Ex. 38, pp. 3-4]; [DSMF ¶ 83]. In determining the appropriate level of discipline for violations of AeroCode 92, all relevant factors are to be considered, "including but not limited to: frequency of the objectionable conduct, severity of the objectionable conduct, and the nature of the objectionable conduct, including whether it is physically threatening or humiliating ...." [Pl.'s Ex. 38, pp. 3-4]; see also [Heiserman Dep., pp. 74-75, Doc. 188-1].

17

## B.  The E-Mail Investigation

About five weeks before the <u>Smith</u> lawsuit was filed, on or about June 19, 2006, Freddie Luster, a black supervisor and Lockheed employee since 1980, notified IT technicians that his work computer was running slowly. [DSMF ¶¶ 1, 2, 18]; [Luster Dep. 29:11-19, Mar. 1, 2010]; <u>Smith</u> [Doc. 1]. While examining Luster's computer, an employee of Lockheed's computer maintenance vendor purportedly uncovered files containing inappropriate images of men.  [DSMF ¶¶ 19, 20]; [Brinson Dep., Pl's Ex. 56, LM-021731]; [Vincent Dep., pp. 31-32].   As a result, Luster's computer was referred to the Company's Security and Emergency Services department ("SES") for investigation. [DSMF ¶ 21]. Before the investigation into Luster's computer began, Calvin Bryant, Lockheed's HR Manager, learned from Latasha Brinson, the SES investigative manager, that SES would be conducting an investigation related to Luster's computer. [Bryant Dep. I, pp. 20-21].  Lockheed's HR organization is in charge of enforcing the company's policies. [<u>Id.</u> at p. 21].

### 1.  Vincent's Forensic Analysis of Freddie Luster's Computer

Under the direction of SES, Scott Vincent performed a forensic analysis of Luster's computer. [DSMF ¶¶ 22, 23]. Vincent's analysis did not reveal any inappropriate photos of men. [Pl's Ex. 56, LM-021732]; [Vincent Dep., pp. 31-32]. His analysis did reveal,

18

however, that Luster had received "e-mails containing inappropriate content, general media files, links to media files, pictures and non-work related content" that were kept in a personal e-mail folder labeled "My Stuff." [Pl.'s Ex. 56, LM-021737, Doc. 182-2 at 11]; [DSMF ¶ 25]. Vincent's forensic analysis of the e-mails in the "My Stuff" folder revealed that Luster, as well as eight 8 other supervisors, 15 salaried non-supervisors, and 23 hourly employees, had come into contact with dozens of allegedly inappropriate emails. [Pl.'s Ex. 56]; [DSMF ¶ 30].

The analysis showed that many of the allegedly inappropriate e-mails received by Luster and the other supervisors were distributed prior to March 2005 by an hourly employee named Dan Hood. [Pl.'s Ex. 56]; [DSMF ¶ 93]; [Pl.'s Ex. 3, LM-000002-0000022]; [PSMF ¶¶ 11-31]. The analysis also showed that Luster received two other inappropriate emails before 2005 from supervisor Anthony Robinson. [Pl.'s Ex. 56, LM-021738-39]; [PSMF ¶¶ 34, 35, 39, 40]. Robinson, like Luster, is black. [Doc. 1]. The analysis revealed that Robinson had received one of the allegedly inappropriate emails he sent Luster from an hourly employee named Warren Pope. [Pl.'s Ex. 56, LM-021759, 21761]. Unlike the other supervisors identified, Vincent's analysis indicated that Robinson did not receive any inappropriate emails from Hood. [PSMF ¶ 33]; [Pl.'s Ex. 56, LM-021761-762].

19

**a. The content of the emails found in the "My Stuff" folder**

**i.  The emails received from Hood**

The emails sent from Hood to supervisors Luster, Brown, Crump, Del-Favero, Gunter, Smrekar, Summers, Willingham, and Winkler included (1) images of females exposing their breasts and/or genitalia (the "Popular Brat," "Bra Size," and "Mary Beth" emails); (2) an audio recording with explicit and derogatory statements about homosexuals, to wit "it seems to me like the gay perspective would be like a couple of big hairy balls dangling in front of your face .... I would even go as far as to say that a gay man, down on all fours, with his lover jack-hammering his backside probably has a very limited perspective, you know, like the floor" (the "Ned Channel" email); (3) a video showing a male character having sex with a bottle with a fake vagina attached to the lid (the "Pill for All Reasons" email); (4) a video referencing a white child as a "redneck" (the "Young Redneck" email); and an image of a white woman in a bikini next to an image of an obese black woman entitled "Camel Toe Contest Between Ms. Canada and Ms. Detroit," both of which show the impression of their genitalia through their clothing (the "Camel Toe Contest" email). [PSMF ¶¶ 13-31].

Other e-mails sent by Hood show images of partially nude women, (the "Chain Letter" and "Friday" emails); women in revealing bathing

20

suits (the "Strings" email); a cartoon image of two lock safes in a sexual position with the subject line, "Safe Sex" (the "Safe Sex" email); a cartoon image entitled "Things that will never happen to you in your lifetime #37" that shows a man sitting next to two women who turn to him and say: "Can you help us, sir? My girlfriend and I are arguing about which of us has the tightest pussy" (the "Dream" email); and a video showing a woman's nipples becoming firm in response to air conditioning (the "Air Conditioning" email). See [Pl.'s Ex. 56, LM-021773-021827, Doc. 182-2,-3].

### ii.  The e-mails sent by Robinson

One of the emails that Robinson sent Luster is entitled, "Fw: Where's my Change?," and contains a movie file showing a black male in a store arguing with an Asian woman about his change. [DSMF ¶ 53]; [PSMF ¶ 34]. In the video, the Asian woman calls the black male "Nigger;" the black youth calls the Asian woman a "Chinese Mother fucker," and a "bitch." [DSMF ¶¶ 54, 55]. Vincent's analysis revealed that Luster forwarded the "Where's my change?" e-mail to his personal email address, "tlluster@hotmail.com," on August 24, 2003. [PSMF ¶¶ 35, 36]; [Pl.'s Ex. 56, LM-021738]. The other email that Robinson sent Luster, "FW: Brazilian Junk n' the Trunk," was received by Luster on November 16, 2004, and again on December 7, 2004. [DSMF ¶¶ 63, 64]; [PSMF ¶¶ 39, 40]. Robinson had received the "Brazilian Junk n' the Trunk" email from Warren Pope. [Pl.'s Ex. 56,

21

LM-021759, 21761].   The "Brazilian Junk n' the Trunk" e-mail shows several images of scantily clad women, including photos displaying full frontal nudity and photos of women bending over with their genitals exposed. [DSMF ¶ 65]; [PSMF ¶ 39].

### b. Vincent's "FAR" and "FTK" Disk

On October 30, 2006, Vincent provided SES investigator Wayne Townsend with a written Forensic Analysis Report ("FAR") of his findings. [DSMF ¶ 32]; [PSMF  ¶ 43]; [Pl.'s Ex. 56].   In his FAR, Vincent wrote that "some examples of these emails are listed below; all movie attachments can be viewed from the included Forensic Analysis Report CD." See [Pl.'s Ex. 56, LM-021738-21768, Doc. 182-2 at 12-42 ]; [DSMF ¶ 33]; [Vincent Decl. ¶ 7].  Vincent did not cite in his FAR to the "Popular Brat," "Bra Size," and "Mary Beth," "Ned Channel," "Young Redneck," "Pill for all Reasons," or "Camel Toe Contest" emails or videos cited above. [Pl.'s Ex. 56 at LM-021738-21768]. Rather, Vincent's examples included the "Chain Letter," "Air Conditioning," "Strings," "Fri.," and "Dream" emails and video. [Id.]; [Vincent Decl. ¶ 7]. Vincent also cited in his FAR to the "Where's my Change?" and "Brazilian Junk in the Trunk" emails that Luster had received from Robinson. [Pl.'s Ex. 56 at LM-021738-21739]; [PSMF ¶¶ 34, 35]. Vincent gave Townsend the aforementioned disk (the "FTK report"), which contained all of the allegedly inappropriate material discovered through the analysis of Luster's

22

computer. [DSMF ¶¶ 32, 34, 35].

## 2. Vincent's Forensic Analysis of the Other Supervisors' Computers

On November 22, 2006, Townsend requested that Vincent perform additional forensics analysis on the work computers used by supervisors Brown, Crump, Del-Favero, Gunter, Robinson, Smrekar, Summers, Willingham, and Winkler, because the analysis of Luster's computer had revealed that each of these supervisors received and failed to report allegedly inappropriate emails. [DSMF ¶ 36]; [PSMF ¶ 46]; [Clark Dep., Pl.'s Ex. 3, LM-000002, 10-11, 42, 50, 59, 69, 77, 86, 94, 102]. Vincent analyzed the identified supervisors' work computers and sent a FAR on each supervisor to Townsend on January 22, 2007. [PSMF ¶ 47]; [Pl.'s Ex. 3, LM-000028-29, 37-38, 45-46, 53-54, 72-73, 80-81, 89-90, 97-98, 105-106]. Vincent amended his written FAR reports on the supervisors and resubmitted them to Townsend on February 7, 2007. [Pl.'s Ex. 3, LM-000030-31, 39-40, 47-48, 55-56, 64-65, 74-75, 82-83, 91-92, 99-100, 107-108].

### a. Vincent's Forensic Analysis of Smrekar's Computer

Vincent's forensic analysis of supervisor Frank Smrekar's work computer revealed that Smrekar (1) sent an allegedly inappropriate e-mail from his home e-mail address to his work e-mail address on November 5, 2006, (2) received two allegedly inappropriate e-mails at his work e-mail address on November 25, 2006, (3) sent an

allegedly inappropriate e-mail entitled "Don't Mix Beer and Viagra" from his work e-mail address to Lockheed employee Vince Ruiz and two others outside of Lockheed on November 30, 2006, and (4) sent an allegedly inappropriate e-mail entitled "FW: Crazy Pictures" from his work e-mail address to six people outside of Lockheed on January 30, 2007. [PSMF ¶¶ 53, 55, 56, 58, 61]; [Pl.'s Ex. 27 at p. 4, Doc. 183-2 at 49]; [Pl.'s Ex. 3 at LM-00009, 11, 12, 17, 82-83]; [Vincent Dep., p. 138 at 13-21, Doc. 194-1 at 35]; [Doc. 184-5 at 12-39].

The "Crazy Pictures" email that Smrekar distributed in January 2007 contains, among other images, the following: (1) A picture entitled "Evolution" that shows an image of a dark-skinned Orc from the film "The Lord of the Rings" with the caption "900 BC Looting," adjacent to an image of a black male with the caption "Current Day Looter," (2) a picture entitled "Why it's important to smile in pictures" that shows a dark-skinned black male in a suit who appears invisible because he is not smiling, (3) a picture of a camel sitting in a parking lot next to several cars under the caption "How to tell if there is a terrorist at the airport," and (4) a picture of a black male wearing a shirt with the Warner Brothers logo that says "If you see da' police warn a brother." See [PSMF ¶ 61]. The image in the email entitled "Beer and Viagra" imitates an exaggeration of a male urinating at a great distance and does not contain any nudity. [DSMF ¶ 103].

24

### b. Vincent's Analysis of Crump's Computer

Vincent's Analysis of Crump's computer revealed that Crump sent an allegedly inappropriate e-mail with the subject line "Memo from the H.R. Department" to supervisors Gillespie and Jaurigue on February 1, 2007. [Pl.'s Ex. 3 at LM-000011, 40-41, Doc. 184-3 at 7-8]; [PSMF ¶ 50]. The e-mail Crump sent is a fake memo from an HR department encouraging employees not to use curse words at work. See [Pl.'s Ex. 3 at LM-000194-196, Doc. 184-5 at 44-46].

### c. Vincent's Analysis of the Remaining Supervisors' Computers

Vincent's analysis of the remaining supervisors' computers, including Robinson's, showed no additional information pertinent to the investigation. See [Pl.'s Ex. 3 at LM-000072-75, Doc. 184-3 at 39-42].

### 3. Townsend Interviews the Supervisors

Following receipt of Vincent's additional FAR reports on the supervisors in February 2007, Townsend interviewed each supervisor who had come into contact with inappropriate e-mail. [DSMF ¶ 36]; [PSMF ¶ 66]. Each supervisor provided Townsend with a hand-written "Voluntary Statement." See, e.g., [Clark Dep., Pl.'s Ex. 3, Doc. 184-3 at 34-35, 43, 51-52]; [Pl.'s Ex. 3, at LM-000015-17].

In Luster's Voluntary Statement, Luster wrote that he had received "a lot" of appropriate and inappropriate e-mails from Hood

in 2004 and 2005 and that he put them in the "My Stuff" folder. [Pl.'s Ex. 3 at LM-000015-16, 67-68]. Luster stated that he "made a file call [sic] my stuff because most of the time [he] was receiving so much of it [that he] didn't have time to read it." [Id. at LM-000067-68]. Luster did not recall forwarding any inappropriate e-mails or reporting them to management. [Id.]. He stated, "At the time I looked at the emails, it did not dawn on me because I was present in my cubicle, just me." [Id.]. Luster wrote that after the policy letter regarding inappropriate email was distributed in 2005, he told Hood to stop sending him emails, at which time they stopped. [Id.]. "As far as the other websites that had been pulled up on my computer [they were] pulled up by employees that worked for me in my area." [Id.]. Luster wrote that he caught an employee named Dan Hubbard looking at an inappropriate site from his computer on several occasions. [Id.]. He wrote that in 2004 and 2005 about twenty (20) people had access to his computer under his log in name, but that he made a habit out of locking his computer after the "letter" came out. [Id.].

    In Robinson's Voluntary Statement, Robinson admitted to Townsend that he sent the two e-mails to Luster in 2003 and 2004, but he did not remember receiving any e-mails. [Pl.'s Ex. 3 at LM-000016-17, 76]. Robinson stated that after the policy letter regarding inappropriate email was distributed in 2005, he stopped

forwarding inappropriate e-mail and would report it to management if he received any. [Id.].

In Smrekar's Voluntary Statement, Smrekar admitted to Townsend that he had received e-mails and videos from Hood in 2004 and 2005. [Pl.'s Ex. 3 at LM-000017, 84-85]. Smrekar stated that he asked Hood to stop sending him the e-mails, at which time they stopped. [Id.]. Smrekar also admitted to sending the "Beer and Viagra" cartoon e-mail on November 30, 2006, and the "Crazy Pictures" email to "friends" on January 30, 2007. [Id.]. Smrekar wrote that "it was not a smart thing to do." [Id.]. He wrote, "In retrospect I should have deleted the material and reported it to my boss." [Id.].

After Townsend completed his interviews and the investigation, he prepared investigative reports ("SES Reports") on each group of employees implicated in the investigation: supervisors, salaried non-supervisors, and hourly employees. [DSMF ¶ 37].

**4. Wayne Townsend's SES Report on the Supervisors**

Townsend's full SES report on the supervisors is 240 pages long. [Pl.'s Ex. 3, LM-000001-000240]. However, the SES report consists of a 22-page condensed report summary, and the remaining pages are attachments. [Id.]; [PSMF ¶ 70]. The attachments to the SES report consist of, among other things, documents relating to each supervisor implicated in the investigation, as well as sample images and text from the allegedly inappropriate e-mails discovered

27

during the investigation. [Pl.'s Ex. 3, LM-000023-000240]. Attachment "N" to the SES report is Vincent's FTK Report on CD. [DSMF ¶ 34, 35]. The CD contains all the inappropriate images and movie files that the supervisors came into contact with, as was discovered in Vincent's analysis of Luster's computer. [PSMF ¶ 75]; [DSMF ¶ 34, 35].

The first two pages of the 22-page SES report summary provide the names of the supervisors who were investigated. [Pl.'s Ex. 3, LM-000001-02]. Pages 2 and 3 of the SES report provide Townsend's historical "summary" of the e-mail investigation. [Pl.'s Ex. 3, LM-000002-000003]. The historical "summary" describes how the investigation began and includes references to the forensic analysis of Luster's hard drive and the "My Stuff" folder. [Id.]. The last sentence of the second paragraph in Townsend's historical "summary" states: "No evidence was found to indicate LUSTER sent inappropriate email." [Pl.'s Ex. 3, LM-000002]. The historical summary also states that "Forensic Analysis indicated that CRUMP, ROBINSON, and SMREKAR had received and forwarded allegedly inappropriate emails and during interviews of each, they admitted receiving and forwarding inappropriate emails. The six (6) remaining SUBJECTS only received allegedly inappropriate email." [Pl.'s Ex. 3, LM-000002]. Townsend noted in the historical "summary" that "[t]he vast majority of this e-mail activity appeared to have occurred prior to March 2005."

28

[Pl.'s Ex. 3, LM-000003].

The next eight 8 pages of the 22-page SES report summary lists the names of each investigated supervisor and cites to examples of emails that each supervisor came into contact with. [Pl.'s Ex. 3, LM-000005-000013]; [Pl.'s Ex. 56, LM-021728-021730]; [PSMF ¶ 72]. Townsend cited in the SES report summary to the fact that Luster received the "Where's my Change?" and "Brazilian Junk in the Trunk" e-mails from Robinson. [Pl.'s Ex. 3, LM-000007-000009]. Townsend also cited that Luster had forwarded "Where's my Change" to his personal email address. [Id.]. For the supervisors who had received emails from Hood, Townsend did not cite to images or videos in the "Popular Brat," "Bra Size," "Mary Beth," "Ned Channel," "Young Redneck," "Pill for all Reasons," or "Camel Toe Contest" emails as examples. See [Pl.'s Ex. 3, LM-000005-000013]. Rather, Townsend cited to the "Chain Letter," "Air Conditioning," "Strings," "Fri.," and "Dream" emails and video. [PSMF ¶ 72]; [Pl.'s Ex. 3, LM-000005-000013].

The 22-page SES report summary also includes a 7-page section entitled "Interviews." [Pl.'s Ex. 3, LM-000013-000019]. The Interviews section contains notes on Townsend's interviews with each supervisor, as well as citations to the attachments containing the supervisors' Voluntary Statements. [Id.]. In the "Interviews" section for Smrekar, Townsend wrote that Smrekar admitted to sending

29

the "Crazy Pictures" email and that Smrekar told him "it was not a smart thing to do." [Pl.'s Ex. 3, LM-000017]. The last three pages of the 22-page SES report summary identify the content of each attachment to the SES report, naming the attachments as "A" through "O". [Pl.'s Ex. 3, LM-000019-000021].

In April 2007, Townsend gave the SES report and a copy of Vincent's forensic analysis on CD ("Attachment N") to Calvin Bryant. [PSMF ¶¶ 73, 74]; [DSMF ¶ 38].

**C. Calvin Bryant and the Disciplinary Review Committee**

While SES was conducting its investigation, Lockheed was litigating <u>Smith</u> and defending itself against charges of reverse race discrimination. Discovery in <u>Smith</u> began in September 2006. [PSMF ¶ 124]. The plaintiffs in <u>Smith</u> deposed Calvin Bryant on March 28, 2007, and again on May 14, 2007. [PSMF ¶ 125]. Phyllis Hogue, Lockheed's in-house counsel, met with Bryant regularly for meetings on cases. [Def.'s Resp. to PSMF ¶ 77]. Hogue's job was to "assist in management of all litigation claims and develop[] strategy with regard to the litigation defense." [PSMF ¶ 78]. Bryant was aware before November 2006 that Luster and Robinson are black. [PSMF ¶ 45].

As he had done in the "No Blacks in NASCAR" email investigation, Bryant created a disciplinary spreadsheet for the instant email investigation. See [Pl.'s Ex. 2, 17, 19]; [Bryant Dep.

30

I, p. 45]; [Bryant Dep., Pl.'s Ex. 20]. Bryant's spreadsheet was intended to be a summary of each employee's actions; it would later be used to guide the disciplinary review committee's discussions. [DSMF ¶ 40]. Bryant chaired the disciplinary review committee. [PSMF ¶ 102]. Bryant was the only member of the committee who knew Luster and Robinson's race when the disciplinary recommendations were ultimately made. [DSMF ¶ 45].

**1.  The Disciplinary Spreadsheet**

During discovery, Lockheed produced three versions of Bryant's disciplinary spreadsheet. Each version contains the following heading: "Lockheed Martin Proprietary Information E-Mail/Internet Investigation 11/06 HRBP Action." <u>See</u> [Clark Dep., Ex. 2; Cooper Dep., Ex. 17; Bryant Dep. I, Ex. 19]; [PSMF ¶ 79].

**a. Consistencies in each version of the spreadsheet**

In the "Comments" column for Luster's name in Bryant's spreadsheet, Bryant wrote that Luster forwarded the "Where's my Change?" email to his "personal email." [PSMF ¶ 80]. In the "Comments" column for Robinson, Bryant wrote that Robinson forwarded the "Where's my Change?" and "Brazilian Junk in the Trunk" emails to Luster. [PSMF ¶ 81]. For the supervisors under investigation, the only emails sent by Hood referenced on Bryant's disciplinary spreadsheet are those included as examples in Townsend's SES report. [PSMF ¶ 82].

31

Bryant did not include or make any reference on his disciplinary spreadsheet to any supervisor having received the "Popular Brat," "Bra Size," "Mary Beth," "Ned Channel," "Pill for all Reasons," "Young Redneck," and "Camel Toe Contest Between Ms. Canada and Ms. Detroit" emails and videos. [PSMF ¶ 83]; [Def.'s Resp. to PSMF ¶ 83]; see also [Pl.'s Ex. 2, 17, 19]. Nor did Bryant include in Smrekar's column that Smrekar had distributed the "Crazy Pictures" email to six recipients outside of Lockheed using his Lockheed email address, on January 30, 2007. [PSMF ¶ 86]; [Pl.'s Ex. 2, 17, 19]. Bryant knew that "Attachment N" to the SES report, which was Vincent's FTK disk, contained "links to e-mails messages, images, and videos identified in the SES report, as well as information not included on the written SES report." [Bryant Decl. ¶ 15]. It is undisputed that Bryant used Vincent's FTK disk to watch material identified in the SES report. [Bryant Decl. ¶ 15].

### b. Changes to the spreadsheet

Bryant prepared the disciplinary spreadsheet marked as Exhibit 17 sometime before preparing the spreadsheet marked Exhibit 19. [PSMF ¶ 92]. Exhibit 17 includes a column entitled "Date of EE Action (last date of activity)" and another column entitled "After Heath Memo of 5/9/05." [PSMF ¶ 87]; [Pl.'s Ex. 17]. Bryant included the "Date of EE Action (last date of activity)" and "After Heath Memo of 5/9/05" columns on Exhibit 17 so he could determine whether

32

an employee's email activity occurred before or after the Heath Memo. [PSMF ¶ 91]; [Bryant Dep. I, pp. 101-08]. The Heath Memo was intended to communicate to the entire workforce that Lockheed does not and will not tolerate offensive emails. [DSMF ¶¶ 12, 13]; [Cooper Dep., pp. 85-86]; [Diffley Dep., p. 45]; [Hamlin Dep., p. 42]. Bryant removed the "After Heath Memo of 5/9/05" column from the disciplinary spreadsheet. [PSMF ¶¶ 92, 93]; Compare [Pl.'s Ex. 17] with [Pl.'s Ex. 19]; [Bryant Dep. I, pp. 130-31]; [Def.'s Resp. to PSMF ¶ 92]. In addition, Bryant removed language from the "Comments" column on Luster, which had previously stated: "no evidence of forwarding??" Compare [Pl.'s Ex. 17 at p. 6] with [Pl.'s Ex. 19 at p. 10].

Bryant also added a column to the Exhibit 19 spreadsheet called "Recommended Action," which shows the recommended disciplinary action for each employee under investigation. Compare [Pl.'s Ex. 17] with [Pl.'s Ex. 19]. For Luster and Robinson, and no others, Bryant wrote "Termination" in the Recommended Action column. [Pl.'s Ex. 19 at p. 10].

**2.  The Disciplinary Review Committee**

Much of what occurred in the disciplinary review committee meeting is disputed by the parties. The committee met one time in December 2007 to determine how each supervisor under investigation should be punished. [PSMF ¶ 99]; [Bryant Dep. II, pp. 327-29]. The

33

committee was made up of senior managers from the Marietta facility: Site Lead for HR Shan Cooper, Senior Manager of HR Calvin Bryant, Senior Manager of Labor Relations Steve Hamlin, Senior Manager of Equal Opportunity Programs Cathy Clark, and Senior Manager of Ethics Gary Diffley. [DSMF ¶ 44]. Mike O'Brien, director of C-130 operations, was also present on the day that discipline for the supervisors was recommended, but the parties dispute whether he was a committee member. [Pl.'s Resp. to DSMF ¶ 44]; see also Clark Dep., Pl.'s Ex. 1; [O'Brien Dep., pp. 5, 21]. Phyllis Hogue, Lockheed's in-house counsel, also attended the disciplinary committee meeting in December 2007. [PSMF ¶ 112]. Hogue considered herself not a member of the disciplinary committee, rather "an advisory role to the committee." [Hogue Dep., pp. 18-20].

Bryant distributed a copy of each of the three SES reports and his spreadsheet for use at discipline review meetings. [DSMF ¶ 43]; [Clark Dep., p. 20]. In determining the specific discipline that was appropriate for each supervisor, the committee considered the content of the material in question and the actions each individual took with respect to the material. [DSMF ¶ 71].

### 3. Luster and Robinson are terminated

On January 11, 2008, Bryant sent an email to Lockheed's Vice President of HR, Tom Heiserman, that outlined for Heiserman "the employees who will receive the most serious discipline." [Bryant

34

Dep., Ex. 22].   Bryant's email stated that he, Cooper, O'Brien,

Hamlin, Clark, Diffley, JR Reynolds, Phyllis Hogue, and Shakilya

Newsome performed a review, and that he, Cooper, Wright, and Hogue

performed a subsequent review. [Id.]. For "Freddie Luster, Assembly

Supervisor, 1980 Seniority," Bryant wrote:

> Luster's PC contained excessive amounts of inappropriate
> material stored in personal folder (approximately 154
> megabytes). Luster was having problems with his computer's
> speed when sought assistance. IT personnel discovered the
> material and reported to security. The material was:
> scantily clad women; nudity; cartoons-sexual innuendo, sex
> acts. There was a movie clip (wheresmychange) containing
> racial slurs he had received from another supervisor -
> Anthony Robinson in 2003.
>
> Recommendation: Termination

[Id.]. For "Anthony Robinson, Assembly Supervisor, 1980 Seniority,"

Bryant wrote:

> In June 2003 Robinson sent a movie clip (wheresmychange)
> containing racial slurs to another supervisor - Freddie
> Luster.
>
> Recommendation: Termination

[Id.].

   Heiserman approved the recommended discipline with no changes.

[Heiserman Dep., p. 88]. Luster and Robinson were fired by Lockheed

Martin on March 14, 2008. [DSMF ¶¶ 87, 88]. The remaining

supervisors who were investigated received discipline in the form of

a "letter of reminder," a "letter of instruction," or no discipline.

[DSMF ¶ 89]. Supervisor Brown is black; Supervisor Jaurigue is

hispanic; and Supervisors Smrekar, Del-Favero, Summers, Winkler, Gunter, Gillespie, Crump, and Willingham are white. [PSMF ¶ 122].

Bryant gave his third and final deposition in <u>Smith</u> on May 28, 2008. [PSMF ¶ 125]. Less than two months later, Lockheed used Luster and Robinson's terminations, and the fact that they had "forwarded a racially offensive email," in their defense in <u>Smith</u> to rebut charges of reverse race discrimination. <u>See</u> <u>Smith</u> [Doc. 180 at 12].

**D. Disputed Material Issues of Fact**

**1. The creation date of the spreadsheet is disputed**

The date that Bryant created and prepared the disciplinary spreadsheet is disputed. In his post-discovery declaration, Bryant states that "the spreadsheet" he created is dated "11/06" but "that date is a typographical error," because he prepared it in November 2007. [Bryant Decl. ¶ 12]. Plaintiffs submit the declaration testimony of Jim Persinger, a computer forensics expert, who states that Bryant's declaration testimony is inconsistent with the Metadata in the electronic file of the version of the spreadsheet known as Exhibit 19. [Persinger Decl. ¶¶ 9-14]; [PSMF ¶ 44]. Persinger states that Bryant's Exhibit 19 spreadsheet was created on November 7, 2006. [<u>Id.</u>].

36

**2. The information Bryant relied upon when creating and updating the spreadsheet is disputed**

**a.  Vincent's FAR and Townsend's SES report**

The information that Bryant relied upon when preparing the spreadsheet is also disputed. Bryant states in his post-discovery declaration that he "did not receive or review Attachment "N," or any other information regarding the investigation until after [he] received the completed SES Reports in April 2007." [Bryant Decl. ¶ 15]. He further states that he "prepared a spreadsheet" for use in the disciplinary committee meetings after receiving the SES report from Townsend. [Bryant Decl. ¶ 15]; see also [Bryant Dep. I, pp. 25, 27]. Luster and Robinson submit that Bryant began creating the disciplinary spreadsheet in November 2006, when the only information available was Vincent's forensic analysis of Luster's computer. [PSMF ¶ 44].

**b. The SES report summary**

The scope of the information that Bryant used from the SES report in preparing his spreadsheet is also in dispute. In his post-discovery declaration, Bryant states:

> When preparing the disciplinary spreadsheet that I presented to the committee, I reviewed and relied upon the summary description of what each employee had done. For the supervisors, this information was included in pages 1 through 13 of the Management SES Report, which was marked Exhibit 3 in my deposition. To the extent I was prompted to do so by something in the summary section of the report, I would reference other areas of the report,

37

> including the interview summaries or the material attached
> as exhibits to the reports or on disks.

[Bryant Decl. ¶ 13]; [DSMF ¶ 41].

Luster and Robinson submit that Bryant prepared his spreadsheet using more than pages 1 through 13 of the SES report and, therefore, must have seen that Smrekar sent the "Crazy Pictures" email. In the "Comments" column for Luster, Bryant wrote that Luster "[c]laims others had access." [Pl.'s Ex. 17]; [Pl.'s Ex. 19, p. 10]. Luster and Robinson show that only two locations in the SES report indicate that Luster told Townsend about other employees having access to his computer: (1) Townsend's interview summary for Luster on pages 15 and 16 of the report and (2) Luster's handwritten "Voluntary Statement" on pages 67 and 68. [Pl.'s Ex. 3, LM-000015-16, 67-68]; [PSMF ¶ 95]. In the "Comments" column for Brown, Bryant typed that Brown "advised his mgr. Former Mgr Garland Ooten remembers Brown came to him about inappropriate emails." [Pl.'s Ex. 17]; [Pl.'s Ex. 19, p. 7]; [PSMF ¶ 96]. Luster and Robinson show that there are only two locations in the SES report indicating that Brown went to his manager about inappropriate emails: (1) Townsend's interview summary for Brown on pages 13 and 14 of the report and (2) Brown's handwritten "Voluntary Statement" on pages 32 and 33. [Pl.'s Ex. 3, LM-000013-14, 32-33]; [PSMF ¶ 97]. The fact that Smrekar forwarded allegedly inappropriate email is indicated on page 2 of the SES

38

report. [Pl.'s Ex. 3, LM-000002]. Smrekar's forwarding of the "Crazy Pictures" email in 2007 is indicated in both the interview summary, which appears on page 17 of the SES report, and in Smrekar's handwritten "Voluntary Statement" on pages 84 and 85. [Pl.'s Ex. 3, LM-000017, 84-85]; [PSMF ¶ 98].

### 3. Whether Bryant formulated his disciplinary decisions before the disciplinary review committee met is disputed

The parties dispute whether Bryant formulated his disciplinary recommendations before the committee met. Luster and Robinson state that Bryant formulated disciplinary recommendations before the committee meeting based on Bryant's post-discovery declaration that he prepared Exhibit 19 in November 2007. [PSMF ¶ 100]; [Bryant Decl. ¶ 29]. Lockheed does not dispute that Bryant began preparing Exhibit 19 in November 2007 but submits that Bryant did not formulate his disciplinary decisions before the committee meeting. [Def.'s Res to PSMF ¶ 100]. Bryant states in his post-discovery declaration that he "believes" he used the Exhibit 17 spreadsheet at the meeting, because it "does not contain recommended disciplinary action." [Bryant Decl. ¶ 12]. In his deposition, Bryant could not recall which spreadsheet was used at the disciplinary meeting, even after Plaintiffs' counsel pointed to the "Recommended Action" column in Exhibit 19. [Bryant Dep. I, p. 41].

39

### III.
### Summary Judgment Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986)). The substantive law applicable to the case determines which facts are material. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Four Parcels, 941 F.2d at 1437-38. If the moving party fails to discharge this initial burden, the motion must be denied. Fitzpatrick v. City of Atlanta, 2 F.3d 112, 1116 (11th Cir. 1993). If the burden is met, however, the non-moving party must then "go beyond the pleadings and . . .

AO 72A
(Rev.8/82)

designate specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324 (citing Fed. R. Civ. P. 56).

**IV.**
**Analysis**

**A. Judicial Estoppel**

Defendant Lockheed submits that Plaintiff Luster's race discrimination claims in this case are barred under the doctrine of judicial estoppel. [Docs. 137-1 at 12-16; 195 at 2-4]. Specifically, Lockheed contends that Luster has taken inconsistent positions under oath in this case and his bankruptcy case, and that he had knowledge of and motive to conceal his claims. [Doc. 137-1 at 2]. Luster responds that he should not be estopped from asserting his Title VII and Section 1981 claims because he made no affirmative misrepresentations to the bankruptcy court; his claims against Lockheed did not exist when he filed for bankruptcy in 2006 or when his Chapter 13 plan was confirmed in 2007; he was unaware of the need to amend his bankruptcy filings until he was deposed by Lockheed in March 2010; and he completed the amendments to his bankruptcy filings on May 4, 2010. [Doc. 179 at 16].

**1. Relevant Facts**

Luster filed a Voluntary Petition with the U.S. Bankruptcy Court for the Northern District of Georgia on December 27, 2006. [DSMF ¶ 124]. The petition required Luster to disclose "any suits

41

and administrative proceedings to which he is or was a party ...."
[DSMF ¶ 125]. His Chapter 13 bankruptcy plan was confirmed on March
28, 2007. [PSMF ¶ 139]. Luster filed the EEOC charge against
Lockheed on July 16, 2008, while his Chapter 13 bankruptcy remained
pending. [PSMF ¶ 140]; [DSMF ¶ 126]. The instant lawsuit was filed
on July 17, 2009. [PSMF ¶ 141]. On September 8, 2009, Lockheed
served Luster its first interrogatories, and Luster was asked if he
had ever been a party to other legal proceedings. [PSMF ¶ 142].
Luster answered the interrogatory and provided the filing date and
case number for his bankruptcy action. [PSMF ¶ 143]. At his March 1,
2010, deposition, Lockheed's counsel questioned Luster about his
bankruptcy filing. [PSMF ¶ 144]. Luster provided truthful answers.
[PSMF ¶ 145]. Luster's bankruptcy attorney amended Luster's
financial disclosures on May 4, 2010. [PSMF ¶ 145]. On December 29,
2011, the bankruptcy Trustee filed a Notice of Completed Plan,
indicating that Luster "has completed payments to creditors pursuant
to terms of the confirmed plan." [PSMF ¶ 148]. As of December 30,
2011, Luster remained under Chapter 13 bankruptcy. [PSMF ¶ 148].

### 2. Relevant Law

Judicial estoppel is designed to "prevent a party from
asserting a claim in a legal proceeding that is inconsistent with a
claim taken by the party in a previous preceding." Robinson v. Tyson
Foods, Inc., 595 F.3d 1269, 1273 (11th Cir. 2010) (citation

42

omitted).   In   the   Eleventh   Circuit,   two   primary   factors   for establishing   the   bar   of   judicial   estoppel   must   be   considered: "First,   it   must   be   shown   that   the   allegedly   inconsistent   positions were   made   under   oath   in   a   prior   proceeding.   Second,   such inconsistencies   must   be   shown   to   have   been   calculated   to   make   a mockery of the judicial system." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002). These factors are not exhaustive, and "courts must always give due consideration to the circumstances of the particular case." See id.

### a. Inconsistent Positions Under Oath

"[The] failure to timely amend a Chapter 13 bankruptcy plan to reflect a pending claim while simultaneously pursing that claim in another court of law constitutes inconsistent positions under oath." Ajaka v. BrooksAmerica Mortgage Corp., 453 F.3d 1339, 1344 (11th Cir. 2006).   Here, Luster had a duty to disclose the instant suit to his bankruptcy estate, and he failed to do so in a timely manner. Accordingly,   Luster's   failure   to   amend   his   bankruptcy   filings constitutes inconsistent positions under oath. Ajaka, 453 F.3d at 1344. The   issue   of   whether   judicial   estoppel   should   apply   will therefore center on Luster's intent.

### b. Mockery of the Judicial System

When considering a party's intent for the purpose of judicial estoppel, a showing of "intentional contradictions, not simple error

43

or inadvertence" is required. <u>Robinson</u>, 595 F.3d at 1275 (quoting <u>Am. Nat'l Bank of Jacksonville v. FDIC</u>, 710 F.2d 1528, 1536 (11th Cir. 1983)). As applied to bankruptcy cases, "the debtor's failure to satisfy [his] statutory disclosure duty is 'inadvertent' only when, in general, the debtor either lacks knowledge of the undisclosed claims or has no motive for their concealment." <u>Barger v. City of Cartersville</u>, 348 F.3d 1289, 1295-96 (11th Cir. 2003). Because Luster had knowledge of both of his claims, the issue of motive is the determining factor here. "The relevant inquiry is [his] intent at the time of non-disclosure." <u>Robinson</u>, 595 F.3d at 1275-76. "While an estopped party's contradiction must be intentional, such intent may be inferred from the record." <u>Burnes</u>, 291 F.3d at 1285. The inference is considered a factual finding by the court and held to a clearly erroneous standard. <u>Robinson</u>, 595 F.3d at 1275.

Lockheed relies heavily on <u>Robinson</u> in arguing that Luster's failure to disclose this lawsuit reveals a motive to conceal. In <u>Robinson</u>, the only issue before the Eleventh Circuit was whether the district court had abused its discretion in applying judicial estoppel. This Court's review of the facts in <u>Robinson</u> fails to convince the undersigned that judicial estoppel is appropriate here. Indeed, the district court inferred that Ms. Robinson had ill intent, in part because she failed to disclose a worker's

44

compensation claim that was pending at the time she declared bankruptcy. In her petition, she wrote "NONE" on the disclosure forms. After she also failed to amend her bankruptcy filings to reflect her Title VII lawsuit against her former employer, the district court found that Ms. Robinson's inconsistent positions were calculated to make a mockery of the judicial system. Facts from which a similar inference can be drawn are not present here.

On the other hand, Roots v. Morehouse Sch. of Medicine, 1:07-cv-0112-JOF, 2009 WL 4798217 (Dec. 8, 2009), relied upon by Luster, reveals facts very similar to the present case. In Roots, Ms. Grady-Hall opted in to an FLSA class action a year and a half after filing Chapter 13 bankruptcy, but she failed to amend her bankruptcy filings. Although a motive to conceal could have been inferred, Ms. Grady-Hall rebutted the inference because she made no affirmative misrepresentations, merely failed to amend, and had no knowledge of her claim at the time her bankruptcy case was filed or at the time her repayment plan was confirmed. Id. District Judge Forrester found that Ms. Grady-Hall's "actions simply do not rise to the level of being 'calculated to make a mockery of the judicial system.'" Id. at *7.

In this case, as in Roots, Luster has made no affirmative misrepresentations. He answered Lockheed's interrogatory truthfully and made no attempt to conceal information in his deposition. The

45

instant lawsuit was not filed until after he filed for bankruptcy, and Luster therefore had no knowledge of this case when he filed for bankruptcy or at the time his Chapter 13 plan was confirmed, since it had not been filed. In short, Luster has rebutted any inference of ill motive. In addition, "[a]s Plaintiff's bankruptcy case has now been amended to include the present claim, and [his] creditors are likely now aware of [his] interest, it would actually hurt [his] creditors to disallow [his] pursuance of this claim." Roots, 2009 WL 4798217, at *8. For these reasons, the Court **RECOMMENDS** that summary judgment under the doctrine of judicial estoppel be **DENIED**.

**B. Plaintiff's Racial Discrimination Claims**

Plaintiff Luster brings claims under Section 1981 and Title VII for alleged racial discrimination relating to his discipline and termination by Defendant Lockheed Martin. [Pl's Am. Compl. Doc. 70 ¶ 1]. In his summary judgment response, Luster argues he has shown a triable issue of fact on his discrimination claims based on his termination on March 18, 2008. Because Section 1981 and Title VII have the same requirements of proof and use the same analytical framework, the discussion and analysis of Luster's Title VII discrimination claim will apply equally to the Section 1981 claim and dictate the same result. Bryant v. Jones, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009); Hardin v. Stynchcomb, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982).

46

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Generally, a plaintiff may establish a prima facie case of discriminatory discharge under Title VII by showing that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside of the protected class. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998) (citing Jones v. Lumberjack Meats, Inc., 680 F.2d 98, 101 (11th Cir. 1982)); Coutu v. Martin Cnty. Bd. of Comm'rs, 47 F.3d 1068, 1073 (11th Cir. 1995).

For a plaintiff to establish a prima facie case for disparate discipline under Title VII — that is, where a plaintiff claims he was differentially treated for violation of a work rule — a different formulation of the prima facie case is sometimes applied. In that case, a plaintiff may be required to show that (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees outside of his protected class more favorably than he was treated; and (4) he was qualified to do the job. Burke-Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (violation

47

of prison non-fraternization rule); <u>EEOC v. Joe's Stone Crab, Inc.</u>, 220 F.3d 1263, 1286 (11th Cir. 2000) (plaintiff failed to prove disparate impact discrimination); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (plaintiff failed to show similarly-situated comparator).

If a plaintiff establishes a prima facie case under either standard, he is entitled to a rebuttable presumption of discriminatory intent on the part of Defendant. <u>Burke-Fowler</u>, 447 F.3d at 1323; <u>Reeves</u>, 530 U.S. at 142; <u>Coutu</u>, 47 F.3d at 1073. To rebut this presumption, the defendant must offer legitimate, nondiscriminatory reasons for terminating the plaintiff. <u>Burke-Fowler</u>, 447 F.3d at 1323; <u>Reeves</u>, 530 U.S. at 142; <u>Coutu</u>, 47 F.3d at 1073; <u>Williams v. Motorola, Inc.</u>, 303 F.3d 1284, 1293 (11th Cir. 2002). If the defendant make this showing, the plaintiff must show that the proffered reasons are mere pretext for discrimination. <u>Burke-Fowler</u>, 447 F.3d at 1323; <u>Reeves</u>, 530 U.S. at 143; <u>Coutu</u>, 47 F.3d at 1073.

**1. Prima Facie Case of Discriminatory Discharge**

**a. Similarly Situated Comparators**

Here, the formulation of the prima facie case applicable to disparate discipline cases will be applied. The parties do not dispute that Luster meets the first, second, and fourth elements of his prima facie case. The third element is the only one at issue.

48

Lockheed contends that Luster cannot show that he was treated differently than a similarly situated person outside his protected class. [Doc. 137-1 at 17-24]. Specifically, Lockheed argues that Luster is "in a category all his own," because none of the other supervisors "saved or distributed any of the materials that were stored in the 'My Stuff' folder." [Doc. 137-1 at 19]. Luster responds that all of the supervisors committed email-related violations that subjected them to termination. [Doc. 179 at 18]. Alternatively, Luster argues that, at the very least, he is similarly situated to Frank Smrekar, who received emails from Hood and "distributed inappropriate materials both inside and outside of Lockheed, including the 'Crazy Pictures' email." [Doc. 179 at 23-24].

When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, the court must evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Burke-Fowler, 447 F.3d at 1323 (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)). A plaintiff must show that he and the non-minority employee with whom he seeks comparison are "similarly situated in all relevant respects." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). In making such a determination, "the quantity and quality of the comparator's misconduct [must] be nearly

49

identical to prevent courts from second-guessing employers'
reasonable decisions and confusing apples with oranges." Burke-
Fowler, 447 F.3d at 1323.

Here, it is undisputed that supervisors Crump, Del-Favero,
Gillespie, Gunter, Luster, Robinson, Smrekar, Summers, Willingham,
and Winkler all violated Lockheed's email policies. Each of these
supervisors were subjects in the same email investigation. They were
grouped together in the investigation as supervisors, separate and
apart from non-management employees.  Lockheed investigated each
supervisor after learning of the same misconduct, namely their
contact with inappropriate email at work. Each supervisor — with the
exception of Robinson — received dozens of offensive and
inappropriate emails from Hood in 2004 and 2005. And, each
supervisor failed to report having received inappropriate and
offensive email from a Company employee. The only supervisor who was
not disciplined was Sedrick Brown, "because he reported the
inappropriate emails he received to his supervisor." [Bryant Decl.
¶ 27]. Accordingly, the remaining investigated supervisors were
"involved in or accused of the same or similar conduct, yet
disciplined in different ways for that conduct." Smith, 644 F.3d at
1326 n.7. Therefore, I conclude that Plaintiff Luster is similarly
situated to the other supervisors in all relevant respects. Burke-
Fowler, 447 F.3d at 1323; Holifield, 115 F.3d at 1562.

50

Far from second guessing Lockheed's "reasonable" decisions or comparing apples to oranges, several additional considerations demand the above finding. Lockheed asserted to this Court in <u>Smith</u> that it has a policy of distinguishing discipline based on employee rank: supervisors have heightened expectations placed on them to report offensive "statements made or jokes that reference a person or group of people because of gender, race, ethnicity, age, physical characteristic, disability, religious beliefs, or sexual preference." [Bryant Dep., Ex. 26]; [PSMF ¶ 4]; [DSMF ¶ 72]; <u>Smith</u>, 644 F.3d at 1323-24. Therefore, every supervisor that failed to report receiving offensive email violated Lockheed's work-place rule. Both Heiserman and Bryant submitted declaration testimony in <u>Smith</u> stating that Lockheed has *fired* every supervisor that it has learned *received* a racially offensive email and failed to report it. [Bryant Dep., Ex. 23 ¶ 15]; [Heiserman Dep., Ex. 44 ¶ 17]. Defendant acknowledges Heiserman and Bryant's prior testimony but suggests now that the supervisors in <u>Smith</u> were fired solely for forwarding offensive email. [Doc. 195 at 6-7]; <u>Compare</u> [Bryant Dep., Ex. 23 ¶ 15]; [Heiserman Dep., Ex. 44 ¶ 17] ("To my knowledge, Lockheed Martin has discharged every ... supervisor who it has learned ... received such an email and failed to report it.") <u>with</u> [Bryant Decl. ¶ 27]; [Heiserman Decl. ¶ 5] ("To my knowledge, the Company has not terminated any supervisors for merely receiving and failing to

51

report offensive or inappropriate email.").

Lockheed further attempts to distinguish Luster's conduct from the other supervisors' by arguing that "every other supervisor told [Hood] to stop sending inappropriate emails, deleted the emails in question, and/or never opened them." [Doc. 137-1 at 19]. Lockheed apparently overlooks the fact that Luster *did* tell Hood to stop sending him emails, a fact that Townsend himself recorded in the SES summary report. See [Pl.'s Ex. 3, LM-000015]. Furthermore, Luster told Hood to stop his inappropriate conduct after the Heath Memo and the policies concerning email usage were more clearly communicated to employees, a fact also noted in the SES report. [Id.]. Unfortunately for Luster, he had already forwarded the "Where's my Change" email to his personal email account over a year before the Heath Memo came out. But, as the Eleventh Circuit noted in Smith:

> Saxon and Nichols (and also Smith, whose conduct was almost identical) likely did not believe that they needed to disclose their actions in forwarding home a racist email.... The language [of the work-place policy] suggests that, to violate the zero tolerance policy, an employee's conduct must somehow injure or put at risk of injury another employee(s). Sending an email home in order to view it privately during off-work hours, without more, does not easily fall within the spirit of such a workplace-conduct rule.

> Nichols, consequently, it can be inferred had no notice that, by forwarding the NASCAR email home, he would be found to have engaged in harassing or discriminatory conduct .... [I]t is reasonable to conclude that Saxon, too, lacked sufficient notice that simply forwarding an email home was a breach.

<u>Smith</u>, 644, F.3d at 1342.

Frank Smrekar, on the other hand, received the emails from Hood in 2004 and 2005, and distributed the "Crazy Pictures" email to six people outside of Lockheed in January 2007, despite having notice that distributing or "forwarding" offensive email is a terminable offense. As a supervisor, Smrekar is both similarly situated to Luster and Robinson, and arguably guilty of more egregious conduct in violation of the clearly stated notice within the Heath Memo.

In meting out discipline for email violations, Lockheed's HR Department developed a number of criteria it used to categorize the supposed egregiousness of employee misconduct. <u>See, e.g.</u>, [Doc. 179 at 30 n.34]. The Company has distinguished sending email from receiving email; internally sent email from externally sent email; "distributing" email from "forwarding" email; supervisors from non-supervisors; full nudity from partial nudity; deleting email from opening email; inappropriate content from offensive content; offensive content from the "offensiveness" of content; reporting email from not reporting email; pre-Heath Memo email activity from post-Heath Memo activity, and, where applicable, the volume of emails in question. <u>See, e.g.</u>,[Bryant Dep. I, pp. 105-28]; [Clark Dep., pp. 22-38]; [Hamlin Dep., pp. 35-57]; [Diffley Dep., pp. 33-52]; [Heiserman Dep., pp. 73-75]. As more fully discussed below, a

53

jury could reasonably infer that Lockheed applies the above criteria in a manner that allows it to achieve a pre-selected result, and, in this case, one with an arguably discriminatory purpose.  The Court therefore declines to consider that Luster's "storage" of emails on his work computer makes him dissimilar to the other supervisors. The bottom line is that the record contains a wealth of circumstantial evidence that creates triable issues of fact concerning Lockheed's discriminatory intent. "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." <u>Smith</u>, 644 F.3d at 1328.

**2.  Legitimate, Nondiscriminatory Reasons**

Once a plaintiff makes out a prima facie case, the defendant has the burden to show a legitimate, non-discriminatory reason for terminating Plaintiff. <u>Reeves</u>, 530 U.S. at 142; <u>Coutu</u>, 47 F.3d at 1073; <u>Williams</u>, 303 F.3d at 1293; <u>Goldsmith</u>, 513 F.3d at 1277. Lockheed's proffered explanation for Luster's termination is that he "fail[ed] to report inappropriate email messages received from employees, retain[ed] an unacceptable amount of these materials in a personal folder on his Lockheed computer, and ... distribut[ed] a racially offensive email. [Doc. 137-1 at 24]. This explanation is sufficient to meet Lockheed's burden of articulating a legitimate, non-discriminatory reason for the termination, as the burden is

54

"exceedingly light." <u>Chapman v. AI Transp.</u>, 180 F.3d 1244, 1249 (11th Cir. 1999) (citation and quotation omitted); <u>Meeks v. Computer Assocs., Int'l</u>, 15 F.3d 1013, 1019 (11th Cir. 1994) (citations and quotations omitted); <u>see also</u> <u>Goldsmith v. Bagby Elevator Co., Inc.</u>, 513 F.3d 1261, 1279 (11th Cir. 2008) ("The employer's evidence must show that its legitimate reason, standing alone, would have induced it to make the same decision.") (internal citation and quotation omitted). Thus, the remaining issue is whether Lockheed's proffered reasons are pretextual.

### 3. Pretext

Once the defendant has articulated a legitimate, non-discriminatory reason for the plaintiff's termination, the burden shifts to the plaintiff to show that the proffered reason is merely a pretext for unlawful discrimination or retaliation. <u>Reeves</u>, 530 U.S. at 143; <u>Coutu</u>, 47 F.3d at 1073; <u>Goldsmith</u>, 513 F.3d at 1277. To show pretext, the plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision." <u>Jackson v. State of Ala. State Tenure Comm'm</u>, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal citation and quotation omitted). At the summary judgment stage, the plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Id.</u> (internal

55

citation and quotation omitted); accord Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010). A defendant's proffered legitimate reason is not credible when a plaintiff "has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal citations and quotations omitted); Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (internal citation and quotation omitted); Alvarez, 610 F.3d at 1265 (citing Combs, 106 F.3d at 1538).

In this case, Luster argues pretext is shown in several ways. [Doc. 179 at 27-34]. His primary arguments center around the fact that he received disparate treatment in comparison to the other supervisors. Lockheed argues that "[w]hile Plaintiff may think that certain circumstances warranted lesser discipline, ...[he] is not allowed to substitute his business judgment for that of the employer .... [A]n employee cannot succeed by simply quarreling with the wisdom of that reason." [Doc. 137-1 at 26] (quotations and citations omitted).

Lockheed is correct that the Court may not second-guess an employer's legitimate business judgment. Rojas v. Florida, 285 F.3d

56

1339, 1344 (11th Cir. 2002) (noting that "whether a business decision is wise or nice or accurate" is not a proper inquiry for the court). An employer may make an employment decision "for a good reason or a bad reason," as long as the employment decision was not motivated by "unlawful discriminatory animus." Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999). However, in this case, Luster has done more than "question[] the wisdom of the employer's reason" because he has shown "inconsistencies" and "weaknesses" in Lockheed's proffered reasons sufficient to raise a genuine issue of material fact that Lockheed's employment decision was actually motivated by "unlawful discriminatory animus." Luster points to inconsistencies in deposition testimony, the changing nature of Lockheed's proffered reasons, and the existence of similarly-situated comparators who were treated more favorably than he and Robinson. See [Doc. 179 at 27-34].

Lockheed contends, however, that the decision-makers were unaware of the fact that Attachment N contained additional videos and that Smrekar distributed the "Crazy Pictures" email. Lockheed relies on Jones v. Gerwens, 874 F.2d 1534, 1541-42 (11th Cir. 1989) for the proposition that only information known to the decision-makers can be considered when deciding whether a plaintiff was dissimilarly treated. See [Doc. 195 at 7]. In Jones, the plaintiff

57

"failed to adduce evidence" that the decision-makers were aware of or consciously overlooked similar violations by comparators. Id. at 1542. Here, however, Luster and Robinson have offered an abundance of circumstantial evidence indicating not only that Bryant was aware of Smrekar's conduct, but also that he knew of or consciously overlooked other emails received by the lesser disciplined supervisors.

As indicated above, Bryant's testimony regarding the information he relied upon to create and prepare his spreadsheet is inconsistent with other evidence in the record. If a jury were to disbelieve Bryant's testimony that, unless otherwise prompted, he relied only upon pages 1 through 13 of the SES report in preparing his spreadsheet, a jury could reasonably infer that Bryant knew of Smrekar's conduct, as well as the content of the videos on the disk known as "Attachment N." Indeed, it is undisputed that Bryant had the full SES report in his possession from April 2007 to July 2007, and again for at least a month before the DRC meeting in December 2007. If a jury were to conclude that Bryant was aware of the contents of the SES report, a jury could draw further permissible inferences from the following facts: (1) Bryant removed the Heath Memo column from the spreadsheet; (2) Bryant removed the language under Luster's column stating "no evidence of forwarding??"; (3) Bryant included references to Hood's emails such as "Strings,"

58

"Friday," and "Air Conditioning" on his spreadsheet, but not to those with potentially racially offensive and/or patently offensive content such as the "Ned Channel," "Young Redneck," "Camel Toe Contest" emails and videos; and (4) Bryant did not include any reference to the "Crazy Pictures" email or the fact that Smrekar distributed it to six people in early 2007. For example, a jury could reasonably conclude that after Bryant discovered Luster and Robinson's involvement with the "Where's my Change?" email, he turned his attention to presenting the investigation results to the DRC in a way that would spotlight Luster and Robinson's conduct and minimize the other supervisors' conduct. See [Doc. 179 at 29]. Alternatively, a jury could reasonably conclude that Bryant consciously overlooked information in the SES report because he was focused on ensuring that Luster and Robinson's email violations resulted in their terminations. Such a conclusion would be further bolstered by the reasonable inference that might be drawn from evidence indicating that Bryant first prepared his spreadsheet in November 2006 (when Vincent's FAR on Luster's computer was the only investigative report available). A jury could also reasonably reject all of Lockheed's explanations for terminating Luster and Robinson. The record is filled with so many inconsistencies, contradictions, and unjustified distinctions from Lockheed HR personnel that this Court has had great difficulty tracking them all.

59

Luster further points to the "ever-changing evaluation criteria" used by Lockheed to justify his termination, which the undersigned alluded to above. See [Doc. 179 at 30 n.34]. Specifically, Luster argues that Lockheed has manipulated its evaluative criteria to reach the disciplinary outcome it desires: (1) sending offensive email to one's personal email address was not considered "distributing" in the "How to Dance Like a White Guy" email investigation but is now considered "forwarding externally" for Luster; (2) the receipt of offensive email and the failure to report it was a terminable offense for the supervisors in Smith but not here; and (3) failing to ensure that subordinates understood Lockheed's email policies after the Heath memo was sent out justified a letter of reprimand for a supervisor named Campbell - yet Smrekar received a letter of reminder (lesser punishment) for sending an inappropriate email to his subordinate, Ruiz. See [Doc. 179 at 34]; see also [Pl.'s Resp. to DSMF ¶¶ 104, 110].

A telling fact in this case is that none of the emails involved in this investigation were brought to the attention of Lockheed's HR as a result of any employee complaint, as was the case in the "No Blacks in NASCAR" investigation. In fact, the instant investigation was launched while the EEOC was ending its investigation of the Smith plaintiffs' charges against Lockheed, only weeks before that case was filed in this Court. Lockheed and Bryant had motivation to

locate and terminate black employees who had engaged in conduct similar to the Smith plaintiffs, especially after the Company had failed to fire the black employees involved in the "How to Dance Like a White Guy" email investigation. Viewing the evidence as a whole in a light most favorable to Luster and Robinson, a jury could reasonably infer that this email investigation effectively ended after Bryant discovered that two black employees had come into contact with a racially offensive email.

### 4. Cat's Paw Theory of Liability

Luster and Robinson both admit that Bryant was the only member of the disciplinary review committee ("DRC") who knew their races when the investigation and disciplinary decisions were made. See [Pl.'s Resp. to DSMF ¶ 45]. Lockheed argues that Luster and Robinson cannot show that Bryant imputed any discriminatory motive to the disciplinary review committee ("DRC") or Heiserman. [Doc. 195 at 14-19]. Lockheed submits that the DRC reviewed and analyzed each SES report, engaged in open discussion, asked questions and requested additional information, and submitted their decision to a vote, thereby curing any discriminatory "taint" that may have motivated Bryant to terminate Luster and Robinson. [Doc. 195 at 18-19]. The evidence shows, however, that a jury could reasonably come to the opposite conclusion.

Under a "cat's paw" theory of causation, a non-decisionmaking

61

employee's discriminatory animus may be imputed to a neutral decision-maker when the decision-makers have not independently investigated the allegations of misconduct. <u>Stimpson v. City of Tuscaloosa</u>, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decision-maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." <u>Id.</u> Under this theory, a plaintiff must "prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." <u>Id.</u> at 1331. "Where a decision-maker conducts his own evaluation and makes an independent decision, his decision is free of the taint of the biased employee." <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1270 (11th Cir. 2001) (citations omitted).

As an initial matter, the DRC members' difficulty in remembering specific details of their meetings for this investigation casts doubt on the veracity and reliability of their post-discovery declaration testimony. <u>See, e.g.</u>, [Pl.'s Resp. to DSMF ¶ 105]. Furthermore, Steve Hamlin testified in his deposition that Bryant was "the lead person who brought information to the committee." [Hamlin Dep., pp. 27-28]. The committee used Bryant's spreadsheet as a "guide," a "roadmap to choose emails to look into

62

further," and a "tracking device." [PSMF ¶ 103]. Cathy Clark described committee meetings by stating that members "ask[ed] questions out loud of one other," but she also admitted that her attention was pointed to the items in Bryant's spreadsheet. [Clark Dep., pp. 20-21]. Clark also admitted that she made no effort to ensure that the report did not contain information not found on the spreadsheet. [Id.]. Likewise, Hamlin stated that, as a practice, he reviews "the information that is presented[,]... making a judgment on that information." [Hamlin Dep., p. 33].

Hamlin remembers Bryant presenting the "Where's my Change?" video at the meeting, but no others. [Hamlin Dep., pp. 27-29]. Mike O'Brien remembers Bryant presenting the "Where's my Change?" video, but no others. [O'Brien Dep., pp. 40-41]. Cathy Clark remembers watching the "Where's my Change?" video and the "Air Conditioning" video, but no others. [Clark Dep., p. 16]. Calvin Bryant remembers showing the disciplinary committee the "Where's my Change?" video, but no others. [Bryant Dep. I, pp. 38-39]. The committee also looked at the content of the "Brazilian Junk n' the Trunk" photos. [PSMF ¶ 109].

Luster and Robinson were the only two Lockheed Martin supervisors who came into contact with the "Where's my Change?" and "Brazilian Junk n' the Trunk" emails. [DSMF ¶ 69]. As the committee did "every time they met," the members discussed the "No Blacks in

63

NASCAR" email so they could ensure that the discipline Luster and Robinson received was consistent with that received by the Smith plaintiffs. [PSMF ¶ 110]; [Def.'s Resp. to PSMF ¶ 110]. Cathy Clark stated that she "looked at the fact that they were leaders. That they had sent, you know, offensive, racially offensive and/or sexually explicit material and they had distributed that content out." [Clark Dep., p. 52]. Hamlin stated that the committee expects an employee who receives an inappropriate email "to report it and to delete it and not to use it, not to view it." [Hamlin Dep., p. 36].

In his deposition, Bryant stated that the committee did not "vote in the sense of, you know, the majority wins.... I got an opinion from each of the committee members as to whether or not they would go - whether or not they agreed with the recommendations." [Bryant Dep. I, at 89]. Diffley and Hamlin described the voting process as a "poll" in which members were asked by the committee leader, usually Bryant, whether they agreed with the proposed level of discipline. [Hamlin Dep., pp. 56-57]; [Diffley Dep., p. 17]. When asked at her deposition if she gave instruction to the committee on disciplinary actions for particular employees, Hogue refused to answer the question under the attorney-client privilege and work product doctrine. [PSMF ¶ 113].

Accordingly, for all of the above reasons, considering the evidence in the light most favorable to the Luster, the undersigned

64

finds that Luster "has cast doubt on [Lockheed's] proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that [Lockheed's] proffered legitimate reason[] [was] not what actually motivated its conduct." <u>Silvera v. Orange Cnty. Sch. Bd.</u>, 244 F.3d 1253, 1258 (11th Cir. 2001). Luster having sufficiently pointed to evidence of pretext, **IT IS RECOMMENDED** that the motion for summary judgment, [Doc. 137], be **DENIED** on his discrimination claims under Title VII and Section 1981.

**C.   Punitive Damages**

Lockheed also seeks summary judgment on the Plaintiffs' claims for punitive damages under Title VII and Section 1981. Lockheed submits that the record is devoid of any evidence that the decision-makers in this case acted with malice or reckless indifference to Luster and Robinson's federally protected rights. [Doc. 137-1 at 33-34]. Lockheed further contends that it has undertaken numerous good faith efforts to comply with Title VII and Section 1981, citing, among other things, the accomplishments of its Human Resources Department. [<u>Id.</u>]. Plaintiffs argue that the evidence in this case supports a jury's reasonable conclusion that Bryant undertook a calculated effort to terminate them so the <u>Smith</u> case could be defended. [Doc. 179 at 35-36].

An award of punitive damages on a Section 1981 claim, just like

a claim under Title VII, must be supported by proof that the employer's conduct was malicious or recklessly indifferent. _Ash v. Tyson Foods, Inc._, 664 F.3d 883, 901 n.11 (11th Cir. 2011). Employers may not be vicariously liable for the discriminatory employment decisions of managerial agents where the decisions are contrary to the employer's good-faith efforts to comply with § 1981. _Kolstad v. Am. Dental Ass'n_, 527 U.S. 526, 536-37 (1999). Rather, punitive damages are available only if "the discriminating employee was high up the corporate hierarchy or ... higher management countenanced or approved his behavior." _Miller v. Kenworth of Dothan, Inc._, 277 F.3d 1269, 1280 (11th Cir. 2002).

Having considered the evidence presented in this case, and in light of the discussion above, the Court cannot conclude that there is no genuine issue of material fact as to liability for punitive damages in this case. The undersigned therefore **RECOMMENDS** that summary judgment be **DENIED** on the issue of punitive damages.

### V.
### Conclusion

In conclusion, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment, [Doc. 137], be **DENIED**.

**SO REPORTED AND RECOMMENDED**, this 24th day of August, 2012.

_s/ E. Clayton Scofield_
E. CLAYTON SCOFIELD III
UNITED STATES MAGISTRATE JUDGE

66